# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

| | |
|---|---|
| SMITH & NEPHEW, INC., <br>     Plaintiff, <br><br> v. <br><br> STRYKER SALES, LLC, <br> CONNOR HOPKINS, and CHRISTIAN SLATER, <br><br>     Defendants. | No. 2:23-cv-02344-SHL-cgc |

## ORDER GRANTING DEFENDANTS' MOTION TO DISSOLVE TEMPORARY RESTRAINING ORDER

Before the Court are Defendants Stryker Sales, LLC, Connor Hopkins, and Christian Slater's Motion to Dissolve Temporary Restraining Order ("TRO"), (ECF No. 8), Plaintiff Smith & Nephew, Inc.'s ("S+N") Response in Opposition, (ECF No. 14), and the Parties' supplemental briefings, (ECF Nos. 16 & 17). Defendants seek to dissolve the ex parte Shelby County Chancery Court TRO, issued on May 31, 2023, (ECF No. 1-1 at PageID 70), arguing that S+N did not demonstrate an emergency requiring the relief granted in the TRO and that S+N is unlikely to succeed on the merits of its claim. In response, S+N seeks to keep the TRO in place, arguing that its evidence of Defendants' unlawful conduct sufficiently supports the TRO. Alternatively, S+N argues that if there are any deficiencies in the TRO, the Court should modify it rather than dissolve it.

For the reasons explained below, the Court **GRANTS** Defendants' Motion and dissolves the TRO in its entirety.

## FACTUAL BACKGROUND

S+N manufactures and distributes medical equipment and devices. Hopkins and Slater worked for S+N as sales representatives, with Hopkins and Slater respectively joining in July 2021 and March 2022. (ECF No. 8-1 at PageID 94.) As part of their responsibilities for S+N, Hopkins and Slater sold trauma products and covered surgeries with S+N customers in Tucson, Arizona. (ECF No. 8-2 at PageID 108; ECF No. 8-3 at PageID 112.) In connection with their employment, Hopkins and Slater signed noncompete and nonsolicitation agreements (the "Agreements"). (ECF No. 13-1 at PageID 137.) The Agreements state, in relevant part, that during their employment with S+N and twelve months thereafter, Hopkins and Slater would not:

> 8.1. Solicit, call upon, service, or engage in effort to divert business from any customer of the Company with whom Employee had contact. . . for the purpose of selling or promoting or attempting to sell or promote the Company's products and/or services, during the two (2) years preceding the termination of Employee's employment with the Company (the "Look Back Period"), . . .
>
> 8.2. Engage in any activity within the Restricted Territory (defined below) for Employee's own benefit, or the benefit of any other person or organization, which activity involves the sale, attempted sale, or promotion of any product or service that is competitive with any product or service. . . for which Employee had material responsibility during the Look Back Period. . . .
>
> 8.3. Perform any job function within the Restricted Territory (defined below) on behalf of any competitor of the Company, which function is similar to or competitive with any of the material job functions Employee performed during the Look Back Period. . . .

(Id.) S+N alleges, and Defendants dispute, that Hopkins and Slater developed significant relationships with clients such that they became "the face" of S+N in Tucson. (Id. at PageID 139.)

On January 26, 2023, Hopkins and Slater resigned from S+N to join Stryker, a competitor in the medical device industry. (ECF No. 8-1 at PageID 95.) Like they did at S+N, Hopkins and Slater sell trauma products and cover surgeries for Stryker clients. (Id. at PageID 94-95.) S+N alleges that, since working for Stryker, Slater and Hopkins have repeatedly and systematically

breached their Agreements. (ECF No. 13-1 at PageID 143.) Specifically, according to S+N, Hopkins and Slater solicited, called upon, serviced, and engaged with former S+N clients on over twenty occasions since working for Stryker. (Id. at PageID 144-49.)

## PROCEDURAL BACKGROUND

S+N filed its Verified Complaint for Damages and Other Equitable and Injunctive Relief in the Chancery Court for Shelby County, Tennessee, on May 31, 2023. (ECF No. 13-1 at PageID 134.) In support of its TRO request, S+N asserted that it had sustained and will continue to sustain immediate and irreparable injury because of Defendants' breaches of the Agreements, and, absent judicial intervention, will continue to suffer irreparable harm in the form of stolen customers, lost customer goodwill, and lost revenue. (Id. at PageID 156.) Based on this information, the Chancery Court issued an ex parte[1] TRO the same day. (ECF No. 1-1 at PageID 69-70.)

Defendants removed the case to this Court on June 1, 2023. (ECF No. 1.) The next day, Defendants filed their Motion to Dissolve. (ECF No. 8.) On June 5, 2023, S+N filed the

---

[1] On May 31, 2023, at 9:53 a.m., S+N's counsel emailed Stryker's Minnesota-based in-house counsel, stating that S+N planned to seek a TRO and that its Chancery Court appearance was scheduled for 11:00 a.m. that day, sixty-seven minutes after sending the e-mail. (ECF No. 8-4 at PageID 116.) If Stryker's in-house counsel immediately left for Memphis, she likely would not have landed at Memphis International Airport until 5:24 p.m., well after the scheduled Chancery Court appearance. See GOOGLE FLIGHTS, https://www.google.com/travel/flights (searching scheduled nonstop flights from Minneapolis-Saint Paul to Memphis). It also seems unlikely that the sixty-seven minutes allowed enough time for Stryker to secure local counsel, who could read the Complaint, prepare for the hearing, drive to 140 Adams Avenue, and find and pay for parking. In other words, it was impossible for Defendants to attend the hearing. Therefore, S+N did not provide reasonable notice and the TRO will be considered ex parte. See Total Quality Logistics, LLC v. Riffe, No. 1:19-CV-23, 2019 WL 340683, at *2 (S.D. Ohio Jan. 28, 2019) ("an email one business day before the issuance of a TRO does not constitute reasonable notice to provide Defendants with a reasonable time to permit an opportunity to be heard"); Abraham v. Jones, 2016 WL 3855204, at *4 n.15 (S.D. Ohio July 15, 2016) (reasonable notice under Fed. R. Civ. P. Rule 65 "consists of information received within a reasonable time to permit an opportunity to be heard.").

complete state court record, (ECF No. 13), and responded in opposition to Defendants' Motion, (ECF No. 14).  The Court held a Motion Hearing on June 6, 2023, at which the Parties relied on their already-filed pleadings and affidavits, offering no new evidence.  (ECF No. 15.)  The Court determined that the TRO would remain in effect until this written order was issued.  (Id.)  Following arguments, the Parties filed supplemental briefings on June 8, 2023.  (ECF Nos. 16 & 17.)

## **LEGAL STANDARD**

In cases removed to federal court, a district court "takes the case up where the State court left it off."  Duncan v. Gegan, 101 U.S. 810, 812 (1879).  Once an action is removed, "federal rather than state law governs the future course of proceedings."  Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cnty., 415 U.S. 423, 437 (1974).  Thus, when evaluating a motion to dissolve a temporary restraining order issued by a state court before removal, "federal law is applied as though the action was originally commenced [in federal court]."  Dolan v. Portaro, No. 1:15-CV01022, 2015 WL 3444351, at *1 (N.D. Ohio May 28, 2015).

The party who obtained the injunctive relief "bears the burden of justifying the need for continued injunctive relief on a temporary basis."  Id. (quoting North Dakota v. U.S. Army Corps of Eng'rs, 264 F.Supp.2d 871, 879 (D.N.D. 2003)).  A motion for a temporary restraining order is considered under the same standard as a preliminary injunction.  See Ohio Democratic Party v. Donald J. Trump for President, Inc., No. 16-4268, 2016 WL 6608962, at *1 (6th Cir. Nov. 6, 2016).  A court is to consider the following four factors in determining whether a plaintiff is entitled to a temporary restraining order or other preliminary injunctive relief:  (1) whether the movant has shown a strong or substantial likelihood or probability of success on the merits;

(2) whether the movant has shown that he or she would suffer irreparable harm if the preliminary relief is not issued; (3) whether the issuance of a preliminary injunction will cause substantial harm to third parties; and (4) whether the public interest would be served by the issuance of a preliminary injunction. Id. These four considerations are factors to be balanced, not prerequisites that must be satisfied. McNeilly v. Land, 684 F.3d 611, 615 (6th Cir. 2012). The factors guide the court's discretion and are not meant to be rigid and unbending requirements. Id.

## ANALYSIS

Defendants seek to dissolve the TRO, arguing that S+N fails to establish irreparable harm and a likelihood of success on the merits. S+N disagrees and argues that the TRO should remain in place because its evidence of Defendants' breach of the Agreements establishes both factors. The Court first discusses the likelihood of success on the merits factor and the interpretive dispute between the Parties over the meaning of "customer" in the Agreements. Next, the Court discusses the irreparable harm factor and whether S+N provided specific proof of loss of business or reputation, whether actual or anticipated. And, finally, the Court briefly discusses the harm to third parties and public interest factors. After considering these four factors, the Court concludes that they weigh in favor of dissolving the TRO.

### I. Likelihood of Success on the Merits

As this case comes to the Court based on diversity jurisdiction, the Court applies state law to determine if the plaintiff has a strong likelihood of success on the merits. Smith & Nephew, Inc., v. Northwest Ortho Plus, Inc, et al, No. 2:12-cv-02476-JPM-dkv, 2012 WL 6607289 (W.D. Tenn. 2012); Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp., 511 F.3d 535, 541 (6th Cir. 2007) (applying state law to a noncompete clause dispute). In

general, covenants not to compete are disfavored in Tennessee and construed strictly in favor of the employee. Murfreesboro Med. Clinic, P.A. v. Udom, 166 S.W.3d 674, 678 (Tenn. 2005). Nonetheless, a noncompete agreement is enforceable if it: (1) protects a legitimate business interest, (2) is reasonable in light of any hardship to the employee and to the public, and (3) imposes time and territorial restrictions that are no greater than necessary to protect an employer's legitimate business interest. Smith & Nephew, Inc., 2012 WL 6607289, at *16. Defendants do not contest the enforceability of the Agreements, thus the Court finds, for the purposes of this Order, that Hopkins and Slater entered into valid and enforceable Agreements and that S+N has business interests worthy of protection. However, the Parties dispute whether Hopkins and Slater breached the Agreements. Therefore, the question is whether S+N can show a substantial likelihood of success on its claim that Hopkins and Slater violated the terms of their Agreements.

S+N asserts that Hopkins and Slater breached the Agreement by soliciting S+N customers with whom they had contact during their tenure at S+N so that they could "hijack" these customers for Stryker's benefit.[2] (ECF No. 14 at PageID 213.) According to S+N, the Agreements prohibit Hopkins and Slater from serving the hospitals and medical facilities that are S+N's customers. (Id. at PageID 215.) S+N alleges that Hopkins and Slater violated this

---

[2] In its Complaint, S+N lists three sections of the Agreements—8.1, 8.2, and 8.3—that are relevant to this case. See supra p. 2. However, S+N's briefing related to the TRO almost exclusively focuses on establishing a breach of Section 8.1's prohibition against soliciting S+N clients. See, e.g., ECF No. 14 at PageID 212 ("[T]he TRO simply requires [Defendants] to find their own customers and prospective customers, as opposed to. . . hijacking S&N's customers and prospective customers,"); Id. at PageID 213 ("Instead of complying with the terms of their Agreements, Slater and Hopkins kept on calling upon and servicing for Stryker the exact same customers that they serviced and called upon for S&N."); ECF No. 17 at PageID 247 ("Slater and Hopkins using the knowledge, training, and relationships that they gained at S&N to hijack S&N's customers is the very conduct that the Agreements are intended to protect S&N from having to endure."). Therefore, this Order only addresses the alleged breach of Section 8.1.

prohibition by visiting and soliciting S+N's customer medical facilities more than twenty times between February and May 2023. (Id. at Page 217.) Citing the affidavit of Curtis Yingling—Hopkins and Slater's former S+N supervisor—S+N alleges that, upon receiving notice of their resignations, they told Hopkins and Slater which fourteen institutional clients they were prohibited from pursuing under the terms of the Agreement. (Id. at PageID 213-14.)

Defendants disagree with S+N, arguing that Hopkins and Slater did not breach the Agreements. They contend that there has been no breach because S+N fails to identify a single surgeon customer that Hopkins and Slater worked with while at S+N but then solicited or serviced on Stryker's behalf. (ECF No. 8-1 at PageID 95.) Defendants further state that, since joining Stryker, Hopkins and Slater have carefully avoided any attempted solicitation of surgeon customers that they worked with while at S+N and that their roles at Stryker are almost exclusively focused on covering procedures with surgeons who are already long-time Stryker customers. (Id.) In their supplemental response, Defendants also state that Stryker has its own pricing contracts in place at each of the fourteen medical facilities at issue. (ECF No. 16 at PageID 232.) Defendants argue that, under the terms of the Agreements, S+N may have a legitimate business interest in not allowing Hopkins and Slater to solicit the surgeon customers whom they worked with while at S+N, but not in preventing them from providing any services at all in the hospitals where those surgeons work. (ECF No. 8-1 at PageID 103.)

As part of the Agreements, Hopkins and Slater agreed not to "Solicit, call upon, service or engage in efforts to divert business from **any customer** of the Company with whom Employee had contact. . ." (ECF No. 1-1 at PageID 9.) At the heart of the Parties' dispute is a disagreement over who should be considered S+N's "customer." S+N argues that the medical

7

facilities themselves are S+N's customers because S+N directly contracts with and bills each of the facilities.  (ECF No. 14 at PageID 215.)

Defendants disagree.  They argue that the individual surgeons are the customers, not the facilities.  (ECF No. 8-1 at PageID 95.)  At the hearing, Defendants argued that the parties to the Agreements would have intended for the "customer" to only include S+N's individual surgeon clients because Hopkins and Slater's job duties at S+N were almost exclusively limited to working with surgeons and covering surgeries, rather than negotiating contracts or prices with hospital administrators.  Furthermore, Defendants allege that Stryker has its own pricing contracts at each of the fourteen hospitals at issue.  (ECF No. 16 at PageID 232.)  Thus, using S+N's interpretation, these hospitals would be both Stryker and S+N customers.  Defendants argue that it is unlikely that the parties to the Agreements would have intended it to be so broad as to bar Stryker employees from servicing Stryker clients, thereby further undermining S+N's interpretation of "customer."  (Id.)  In response, S+N argues that individual surgeons should not be considered the "customer" because they do not have authority to purchase products, but rather they request the products from the hospitals, who, in turn, receive and pay the invoices issued by S+N.  (ECF No. 17 at PageID 247-48.)

When resolving a dispute concerning contract interpretation such as this one, Tennessee courts ascertain the intent of the parties based upon the usual, natural, and ordinary meaning of the contractual language.  Teter v. Republic Parking Sys., Inc., 181 S.W.3d 330, 342 (Tenn. 2005).  "The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern."  Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc., 78 S.W.3d 885, 890 (Tenn. 2002).  Specific to this case, noncompete agreements are strictly construed in favor of the employee.  Murfreesboro Med. Clinic, P.A., 166

S.W.3d at 678.  Furthermore, the employer, as drafter of the agreement, must "take responsibility for its allegedly ambiguous provisions."  B & L Corp. v. Thomas & Thomgren, Inc., 917 S.W.2d 674, 678 (Tenn. Ct. App.1995); see also Selox v. Ford, 675 S.W.2d 474, 476 (Tenn. 1984) ("Post-employment restraints are scrutinized with particular care because they are often the product of unequal bargaining power and because the employee is likely to give scant attention to the hardship he may later suffer through the loss of his livelihood.").

Based on the evidence presented thus far and within the context of that proof, it is unlikely that the parties to the Agreements would have intended "customer" to include hospital and medical facilities.  Hopkins and Slater's affidavits state that they were hired by S+N to sell trauma products and cover operations for surgeons—many of whom are not employed by the hospitals where they operate.  (ECF No. 8-2 at PageID 108.)  Neither individual was involved in negotiating contracts or setting pricing with the hospitals.  (ECF No. 16-1 at PageID 236; ECF No. 16-2 at PageID 240.)  S+N does not dispute this characterization of Hopkins and Slater's job duties.  Rather, they argue that the parties to the Agreements understood the medical facilities to be the "customers" because S+N directly contracts with and bills those medical facilities for the products used by surgeons.  However, given that Hopkins and Slater had no role in negotiating these contracts or any direct contact with hospital administrators, it is reasonable that, at the time of the execution of the Agreements, the parties would have understood "customer" to be focused on the surgeons with which the two worked.  Thus, the Court finds that S+N, Hopkins, and Slater likely intended for "customer" to refer to the individual surgeons making the decision about which type of medical devices to use, and not the hospitals who pay and contract with S+N.

Furthermore, even assuming arguendo that there is genuine ambiguity about how to interpret "customer," this ambiguity would be construed in Defendants' favor.  See Murfreesboro

Med. Clinic, P.A., 166 S.W.3d at 678. As this litigation develops, S+N may introduce specific evidence showing that Hopkins and Slater breached the Agreements by soliciting or attempting to solicit S+N customer surgeons or that the Agreements were intended to have a wider scope. However, at this stage, the Court finds that S+N cannot show a likelihood of success on the merits of its claim.

## II.     Irreparable Harm

The second factor to be considered when determining whether to issue injunctive relief is the "irreparable harm that could result if the injunction is not issued." Smith + Nephew, Inc. v. Stryker Emp. Co., LLC, No. 21-CV-2772-SHL-CGC, 2021 WL 8697765, at *7 (W.D. Tenn. Dec. 30, 2021). The showing of irreparable harm is likely the most important factor in a TRO application. See D.T. v. Sumner County Schools, 942 F.3d 324, 326-27 (6th Cir. 2019) ("That factor [irreparable harm] is indispensable: If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief now as opposed to at the end of the lawsuit. . . . although the extent of an injury may be balanced against other factors, the existence of an irreparable injury is mandatory.) (emphasis in original); see also 11A Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURES § 2948.1 (3d ed. 2023) (Irreparable harm is "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction. . .").

S+N argues that Hopkins and Slater's violations of the Agreements caused S+N to suffer "a loss of business reputation and customer goodwill that cannot be measured in dollars and cents." (ECF No. 14 at PageID 219.) In support, S+N argues that Slater and Hopkins were "the face" of S+N at the medical institutions they serviced and that its reputation will suffer from prominent former S+N employees working with S+N customers on Stryker's behalf and attempting to persuade S+N's customer to switch their business to Stryker. (Id.)

10

Defendants respond that S+N fails to make a showing of irreparable harm for two reasons. First, Defendants argue that, although the alleged violations began in February 2023, S+N did not seek a TRO until May 31, 2023, and this months-long delay in seeking a TRO is significant evidence that no such irreparable harm exists. (ECF No. 8-1 at PageID 101-02.) Second, Defendants argue that S+N fails to provide any specific allegations that could form the basis of a showing of irreparable harm, such as evidence of S+N customers switching to Stryker or S+N suffering a loss of business reputation or customer goodwill. (ECF No. 16 at PageID 230-31.)

Defendants first argument is unpersuasive. In their filings, both Parties state that they unsuccessfully attempted to resolve their dispute without judicial intervention. (ECF No. 8-1 at PageID 96; ECF No. 14 at PageID 218.) After failing to come to an agreement and observing more frequent alleged violations of the Agreements, S+N decided that it could no longer avoid the threat of irreparable harm without seeking injunctive relief. (ECF No. 14 at PageID 217.) While in some cases a long delay in seeking a TRO will undermine a showing of irreparable harm, here, under the circumstances, S+N did not unreasonably delay in waiting four months before seeking a TRO. See cf. Total Quality Logistics, LLC v. III's Hotshot, Inc., No. 1:17-cv-352, 2017 WL 5972001, at *4-5 (S.D. Ohio Dec. 1, 2017) (finding that employer's eleven-month delay in bringing its claims severely undermined its request for a TRO).

However, Defendants' second argument is more persuasive. S+N alleges that Hopkins and Slater solicited their former S+N clients on over twenty occasions. However, as Defendants illustrate, S+N fails to provide specific evidence of S+N losing a client to Stryker, or even Hopkins and Slater communicating with S+N client doctors. S+N's evidence of "solicitation" consists of vendor log entries and photographs that show Hopkins and Slater visiting various

Tucson medical facilities while working for Stryker.  (See ECF No. 13-1 at PageID 183-85.)  However, merely visiting a facility where S+N clients may be present is insufficient to show that S+N was at risk of suffering immediate and irreparable harm, especially when Stryker clients are also present at those same facilities.

S+N also argues that it is suffering a loss of business reputation and customer goodwill because Hopkins and Slater were "the face" of S+N's sales team in Tucson.  In support, S+N alleges that Slate and Hopkins routinely provided training sessions and on-site "in-service" programs to medical facility personnel.  (ECF No. 17 at PageID 246-47.)  However, S+N fails to provide specific evidence—such as affidavits from hospital administrators attesting to Hopkins and Slater's reputation at S+N or the degree of their involvement with hospital staff—to support this argument.  S+N's assertion that Hopkins and Slater were "the face" of S+N in Tucson is further undermined by the two employees' relatively short tenure at S+N:  approximately eighteen months for Hopkins and ten months for Slater.  And, in an affidavit attached to Defendants' supplemental briefing, Hopkins states that he never attended or participated in a single in-service or training for facility personnel.  (ECF No. 16-1 at PageID 236.)  Slater also states in an affidavit that he only attended one in-service training at a single facility in which he only had limited participation.  (ECF No. 16-2 at PageID 239.)  Therefore, because S+N failed to provide evidence of loss of business or reputation, or actions that might lead to such a loss, the Court finds that it failed to make a showing of irreparable harm.

**III.     Harm to Third Parties**

Defendants argue that, because of the TRO, Hopkins and Slater are currently not working with any surgeon customers anywhere.  (ECF No. 8-1 at PageID 104.)  As a result, Defendants allege that Stryker has lost a significant percentage of its Tucson workforce, resulting in

additional stress on its other team members in covering surgeries in the area. (Id.)  Given Defendants allegations of harm to Stryker's sales operations in Tucson, and absent evidence to the contrary, the Court finds that this factor weighs in Defendants' favor.

IV.     **Public Interest**[3]

"Tennessee and the Sixth Circuit recognize a public interest in enforcing contracts as written." Smith & Nephew, Inc., 2012 WL 6607289 at *14.  On the other hand, restraints of trade such as noncompete agreements are disfavored in Tennessee.  Murfreesboro Med. Clinic, 166 S.W.3d at 678.  Therefore, the Court finds that this factor does not weigh in either Parties' favor.

## CONCLUSION

After considering these four factors, the Court finds that, on balance, they weigh in favor of dissolving the TRO.  S+N failed to meet its burden of justifying the need for continued injunctive relief on a temporary basis.  Therefore, the Court finds that S+N is not entitled to continued injunctive relief and **GRANTS** the Motion to Dissolve the TRO.

**IT IS SO ORDERED,** this 13th day of June, 2023.

s/ Sheryl H. Lipman
SHERYL H. LIPMAN
CHIEF UNITED STATES DISTRICT JUDGE

---

[3] Neither Party raises an argument related to the public interest.