**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | |
|---|---|
| SMITH & NEPHEW, INC., ) | |
|      Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | No. 2:23-cv-02344-SHL-cgc |
| STRYKER SALES, LLC, ) | |
| CONNOR HOPKINS, and CHRISTIAN ) | |
| SLATER, ) | |
|      Defendants. ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Before the Court are Plaintiff Smith & Nephew, Inc.'s ("S+N") Motion for Preliminary Injunction, (ECF No. 50), Defendants Stryker Sales, LLC ("Stryker'), Connor Hopkins, and Christian Slater's Response in Opposition, (ECF No. 50), and S+N's Post-Injunction Hearing Reply Brief, (ECF No. 55).

In its Motion, S+N requests that Defendants be enjoined from violating noncompete and nonsolicitation agreements that Hopkins and Slater entered into while working for S+N. For the reasons discussed below, the Motion is **DENIED**.

## FACTUAL BACKGROUND[1]

Both S+N and Stryker manufacture and distribute medical equipment and devices. (ECF No. 50 at PageID 779, 784.) Hopkins and Slater first worked for S+N as sales representatives, with Hopkins and Slater joining in July 2021 and March 2022, respectively. (Id. at PageID 779.) Then, on January 26, 2023, Hopkins and Slater resigned from S+N to join Stryker, a direct competitor in the medical device industry, leading to this lawsuit. (Id. at PageID 785.)

---

[1] In reaching its factual findings, the Court relies on the testimony offered at the July 27, 2023 hearing and the Parties' post-hearing filings.

During their tenure with S+N, Hopkins and Slater sold trauma products and covered surgeries with S+N customers in Tucson, Arizona.  (Id. at 780–81.)  In connection with their employment, Hopkins and Slater attended a training program at S+N's headquarters in Memphis that primarily addressed general human anatomy and S+N specific products.  (ECF No. 54 at PageID 823.)

As part of their S+N employment, Hopkins and Slater signed noncompete and nonsolicitation agreements (the "Agreements").  (ECF No. 50 at PageID 779.)  The Agreements state, in relevant part, that during their employment with S+N and twelve months thereafter, Hopkins and Slater would not:

> 8.1.  Solicit, call upon, service, or engage in effort to divert business from any customer of the Company with whom Employee had contact. . . for the purpose of selling or promoting or attempting to sell or promote the Company's products and/or services, during the two (2) years preceding the termination of Employee's employment with the Company (the "Look Back Period"), . . .
>
> 8.2.  Engage in any activity within the Restricted Territory (defined below) for Employee's own benefit, or the benefit of any other person or organization, which activity involves the sale, attempted sale, or promotion of any product or service that is competitive with any product or service. . . for which Employee had material responsibility during the Look Back Period. . . .
>
> 8.3.  Perform any job function within the Restricted Territory (defined below) on behalf of any competitor of the Company, which function is similar to or competitive with any of the material job functions Employee performed during the Look Back Period.  This prohibition includes performing any such job function as an employee . . .

(Id. at PageID 779–80.)  The Agreements define "Restricted Territory" as "any geographic territories and/or accounts (a) assigned to Employee during the Look Back Period, (b) where Employee solicited and/or serviced customers during the Look Back Period, and (c) for which Employee was responsible at any time during the Look Back Period."  (Id. at PageID 780.)

S+N alleges, and Defendants dispute, that Hopkins and Slater developed significant relationships with customers such that they quickly became "the face" of S+N in Tucson and had

extensive interactions with hospital staff and administrators.  (Id. at PageID 781–82.)  Hopkins and Slater testified that they mainly worked with individual surgeons and had minimal interactions with other members of hospital staffs.  (ECF No. 54 at PageID 823–24.)  As part of their duties, Hopkins and Slater emailed purchase orders to an email account associated with hospital billing departments.  (Id. at PageID 824.)

While at S+N, Hopkins and Slater covered surgeries for Dr. Lisa Truchan.  (Id. at PageID 830–31.)  However, several months before Hopkins and Slater joined Stryker, Dr. Truchan stopped purchasing S+N products and switched to Stryker because S+N fired her preferred sales representative.  (Id.)  Slater testified that, in his current role at Stryker he had covered surgeries for Dr. Truchan, but that he stopped several months prior because there was a "gray area" about whether working with her would run afoul of the Agreements' noncompete provisions.  (ECF No. 49 at PageID 738:14–739:1.)

S+N also alleges, and Defendants dispute that, as part of their employment, Hopkins and Slater had access to confidential, trade secret, and proprietary information.  (ECF No. 50 at PageID 782.)  Hopkins and Slater testified that, in their current roles at Stryker, they do not use any confidential information they learned at S+N and have not disclosed such information to anyone else at Stryker.  (ECF No. 54 at PageID 826.)

In their new roles with Stryker, Hopkins and Slater sell trauma products and cover surgeries for Stryker customers.  (Id.)  S+N alleges that, since working for Stryker, Hopkins and Slater have repeatedly breached the Agreements by soliciting and selling to the exact same Tucson-area medical care facilities and surgeons they called on while working for S+N.  (ECF No. 50 at PageID 783.)  S+N also alleges that Hopkins and Slater, with the aid of Stryker, are violating the Agreements by using S+N's confidential and proprietary business information and

trade secrets to give Stryker a competitive advantage at S+N's expense.  (Id.)  Finally, S+N alleges that Hopkins and Slater are breaching the agreements by engaging in the sale or promotion of competing products or services within the "Restricted Territory" and performing job functions in the Restricted Territory on behalf of Stryker.  (Id. at PageID 785.)

## PROCEDURAL BACKGROUND

S+N filed its Verified Complaint for Damages and Other Equitable and Injunctive Relief in the Chancery Court for Shelby County, Tennessee, on May 31, 2023.  (ECF No. 13-1 at PageID 134.)  In requesting a Temporary Restraining Order ("TRO"), S+N asserted that it had sustained, and would continue to sustain, immediate and irreparable injury because of Defendants' breaches of the Agreements, and, absent judicial intervention, would continue to suffer irreparable harm in the form of stolen customers, lost customer goodwill, and lost revenue. (Id. at PageID 156.)  Based on this information, the Chancery Court issued an ex parte TRO. (ECF No. 1-1 at PageID 69–70.)

Defendants removed the case to this Court on June 1, 2023.  (ECF No. 1.)  The next day, they filed their motion to dissolve the TRO.  (ECF No. 8.)  In their response to the motion to dissolve, S+N argued that the TRO should remain in place because Hopkins and Slater breached Section 8.1 of the Agreements by soliciting S+N customers with whom they had contact during their tenure at S+N so that they could hijack these customers for Stryker's benefit.  (ECF No. 14 at PageID 213.)  At a motion hearing on June 6, 2023, the Court determined that the TRO would remain in effect until a written order was issued.  (ECF No. 15.)

On June 13, 2023, the Court issued a written order, granting Defendants' motion and dissolving the TRO in its entirety.  (ECF No. 21.)  The Court explained that, based on the evidence presented, the injunctive relief factors weighed in favor of dissolving the TRO.  (Id. at

PageID 279.)  Specifically, the Court held that S+N failed to show a breach of Section 8.1, and, thus, could not establish a likelihood of success on the merits of its claim.  (Id. at 283–84.)  The Court also held that S+N failed to provide evidence of loss of business or reputation that could support a showing of irreparable harm.  (Id. at 286.)

The Court held a Preliminary Injunction Hearing on July 27, 2023.  (ECF No. 46.)  At the hearing, Scott Curtis and Michael Mohoric testified on S+N's behalf.  Curtis is S+N's vice president of sales for trauma and extremities and Mohoric is S+N's sales director for the Southwest United States.  Hopkins and Slater testified for Defendants.  On August 4, 2023, S+N filed its Motion for Preliminary Injunction and Post-Injunction Hearing Brief.  (ECF Nos. 50 & 51.)  Defendants responded on August 14th, (ECF Nos. 53 & 54), and S+N replied on August 18, 2023, (ECF No. 55).

## LEGAL STANDARD

The Court must balance four factors when determining whether a plaintiff is entitled to preliminary injunctive relief: (1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant has shown that he or she would suffer irreparable harm if the preliminary relief is not issued; (3) whether the issuance of a preliminary injunction will cause substantial harm to third parties; and (4) whether the public interest would be served by the issuance of a preliminary injunction.  Sandison v. Mich. High Sch. Athletic Ass'n, 64 F.3d 1026, 1030 (6th Cir. 1995).  These four considerations are factors to be balanced, not prerequisites that must be satisfied.  McNeilly v. Land, 684 F.3d 611, 615 (6th Cir. 2012).  The factors guide the court's discretion and are not meant to be rigid and unbending requirements.  Id.  The party seeking the preliminary injunction bears the burden of justifying such relief.  Id.

## ANALYSIS

S+N seeks a preliminary injunction, arguing that Hopkins and Slater are violating their respective Agreements.  Specifically, S+N alleges that, since working for Stryker, Hopkins and Slater have repeatedly solicited the exact same Tucson-area medical care facilities and surgeons they serviced while working for S+N.  (ECF No. 51 at PageID 801–02.)  S+N also alleges that Hopkins and Slater are engaging in the sale or promotion of competing products or services within the "Restricted Territory" and performing job functions in the Restricted Territory on behalf of Stryker.  (Id. at PageID 797.)  Defendants oppose a preliminary injunction.  They argue that S+N fails to identify a violation of the Agreements and fails to identify any harm that it suffered.  (ECF No. 54 at PageID 821.)

The Court first considers the likelihood of success on the merits factor and the interpretive disputes between the Parties over the customer- and territory-based restrictions found in the Agreements.  As part of the likelihood of success analysis, the Court addresses whether the Agreements' noncompete provisions protect S+N's legitimate business interest.  Next, the Court evaluates whether S+N has provided sufficient evidence to establish irreparable harm.  Finally, the Court briefly discusses the public interest factor.[2]  After considering these factors, the Court concludes that they weigh against granting injunctive relief.

### I.      Likelihood of Success on the Merits

A party requesting a preliminary injunction must demonstrate "a strong likelihood of success on the merits."  Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp., 511 F.3d 535, 543 (6th Cir. 2007) (quoting Tumblebus Inc. v. Cranmer, 399 F.3d 754, 760 (6th Cir.

---

[2] Neither party raises an argument about harm to third parties.  Therefore, the Court does not discuss this factor.

2005)). While the party is not required to fully prove its case at this stage, it must show "more than a mere possibility of success." Id.

The Parties dispute the meaning and scope of several of the Agreements' noncompete provisions. When resolving a dispute concerning contract interpretation, Tennessee courts look to the intent of the parties based on the usual, natural, and ordinary meaning of the contractual language. Teter v. Republic Parking Sys., Inc., 181 S.W.3d 330, 342 (Tenn. 2005). "The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern." Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc., 78 S.W.3d 885, 890 (Tenn. 2002).

Relevant here, noncompete agreements are strictly construed in favor of the employee. Murfreesboro Med. Clinic, P.A. v. Udom, 166 S.W.3d 674, 678 (Tenn. 2005). The employer, as drafter of the agreement, "must take responsibility for its allegedly ambiguous provisions." B & L Corp. v. Thomas & Thomgren, Inc., 917 S.W.2d 674, 678 (Tenn. Ct. App. 1995) (citation omitted); see also Selox v. Ford, 675 S.W.2d 474, 476 (Tenn. 1984) ("Post-employment restraints are scrutinized with particular care because they are often the product of unequal bargaining power and because the employee is likely to give scant attention to the hardship he may later suffer through the loss of his livelihood.") (citation omitted).

Additionally, noncompete clauses are disfavored under Tennessee law as restraints on trade. Hasty v. Rent-A-Driver, Inc., 671 S.W.2d 471, 472 (Tenn. 1984). However, such clauses may be enforceable so long as the employer has a protectable business interest. Vantage Tech., LLC v. Cross, 17 S.W.3d 637, 644 (Tenn. Ct. App. 1999). Tennessee courts recognize three situations leading to protectable business interests: "(1) whether the employer provided the employee with specialized training; (2) whether the employee is given access to trade or business

secrets or other confidential information; and (3) whether the employer's customers tend to associate the employer's business with the employee due to the employee's repeated contacts with the customers on behalf of the employer." Id. A non-compete clause will only be enforced if the employer can show "special facts present over and above ordinary competition . . . such that without the covenant not to compete the employee would gain an unfair advantage in future competition with the employer." Hasty, 671 S.W.2d at 473 (citation omitted).

S+N argues that Defendants violated two provisions of the Agreements: the customer-based restriction in Section 8.1 and the territory-based restriction in Sections 8.2 and 8.3. Each is considered below, followed by an assessment of whether S+N has a protectable business interest.

### A. Customer-Based Restriction

As with the TRO, S+N asserts that Hopkins and Slater are breaching Section 8.1 by soliciting S+N customers with whom they had contact during their tenure at S+N. (ECF No. 14 at PageID 213; ECF No. 51 at PageID 801–02.) In Section 8.1, Hopkins and Slater agreed not to "[s]olicit, call upon, service or engage in efforts to divert business from **any customer** of the Company with whom Employee had contact . . . ." (ECF No. 1-1 at PageID 9) (emphasis added). S+N alleges that Hopkins and Slater violated this prohibition by visiting and soliciting S+N's customer medical facilities on Stryker's behalf. (ECF No. 51 at PageID 801–02.) Defendants disagree, arguing that Hopkins and Slater have carefully avoided any attempted solicitation of surgeon customers with whom they worked while at S+N, and that their roles at Stryker are almost exclusively focused on covering procedures with surgeons who are already established Stryker customers. (ECF No. 54 at PageID 830–31.)

Just as was the case in the motion to dissolve the TRO, the Parties' dispute over Section 8.1 boils down to a disagreement over who should be considered S+N's "customer." According

to S+N, customer refers to the hospital, surgeon, and all other hospital staff within the "customer ecosystem." (ECF No. 51 at PageID 802.)  Defendants disagree, arguing that customer refers only to the individual surgeons, not the entire hospitals. (ECF No. 54 at PageID 828.)

In dissolving the TRO, the Court found it unlikely that the parties to the Agreements would have intended "customer" to include entire hospitals. (ECF No. 21 at PageID 283.) Although the evidence showed that S+N (and Stryker) contract directly with medical facilities for products used by surgeons,[3] the Court explained that, because Hopkins and Slater had no role in negotiating these contracts and had very limited contact with hospital administrators, the parties would have likely understood "customer" as referring to the surgeons with whom the two worked. (Id.)  The Court also explained that, even if there were genuine ambiguity in the meaning of "customer," Tennessee's rules of construction require this ambiguity to be construed in Defendants' favor. (Id. at PageID 283–84.)

Though the motion to dissolve was granted, the Court noted that its decision was based on the evidence presented up to that point, and that its interpretation of "customer" could change later in the litigation if S+N introduced specific evidence showing that Section 8.1 was intended to have a wider scope. (Id. at PageID 284.)  Now, at the preliminary injunction stage, S+N believes that it has introduced such evidence.  In arguing that "customer" includes hospitals, S+N points to two new pieces of evidence: Stryker's noncompete agreements with Hopkins and Slater and Mohoric's and Curtis' testimony about the medical device industry. (ECF No. 51 at PageID 802-07.)  However, as explained below, neither of these pieces of evidence changes the Court's interpretation of "customer."

---

[3] Indeed, the evidence indicates that both companies have contracts with the hospitals where Hopkins and Slater covered surgeries, thus allowing the surgeons to choose which company's devices to use.

Stryker's noncompete agreements with Hopkins and Slater define "customer" as "any current or prospective account, customer, current or prospective hospital, or current or prospective group purchasing organization with whom a Stryker employee has had direct or material contact . . . ." (Ex. 10.)  S+N argues that "customer" in Section 8.1 should be read to include facilities because Stryker's agreements define "customer" to include hospitals.  (ECF No. 51 at PageID 807.)  However, this argument is unavailing.  To begin, Stryker's noncompete agreements have no relevance to the Parties' dispute over the customer-based restriction in S+N's Agreement.  In interpreting the Agreements' meaning, the key inquiry is to determine the intent of the contracting parties <u>at the time</u> of execution.  <u>See</u> <u>Planters Gin Co. v. Fed. Compress & Warehouse Co.</u>, 78 S.W.3d 885, 890 (Tenn. 2002) (emphasis added).  At the time Hopkins and Slater entered into the Agreements with S+N, they had no knowledge of their future, not-yet-in-existence noncompete agreements with Stryker, such that it could not inform their understanding of "customer."  And, as stated in Defendants' response, to the extent that Stryker's agreements have any probative value in this dispute, they actually undermine S+N's position because they show that S+N could have drafted the Agreements to specifically include hospitals, but chose not to do so.  (<u>See</u> ECF No. 54 at PageID 829.)

S+N's argument based on Mohoric's and Curtis' testimony is also unpersuasive. Mohoric testified that, in general, successful sales representatives build important relationships with various staff member within the "hospital ecosystem."  He stated that decisions over which medical devices to purchase are made by everyone in the ecosystem, not just surgeons. (ECF No. 49 at PageID 617:18-618:21.)  Mohoric, as well as Curtis, also testified about how, over time, hospital administrators have supplanted surgeons' decision-making authority over which medical devices to purchase.  (<u>Id.</u> at PageID 528:20-529:11, 557:15-558:11.)  As an example, Mohoric

cited a recent incident at a CommonSpirit hospital in Southern Colorado where hospital administrators dictated the types of medical devices that surgeons could use, over the surgeons' objections.  (Id. at PageID 558:12-559:21.)  S+N argues that, in light of how the medical device industry operates today with multiple decisionmakers within the hospital ecosystem, it would be unreasonable to read "customer" as only referring to surgeons.  (ECF No. 51 at PageID 805.)

While Mohoric and Curtis provided extensive testimony about the medical device industry in general, they failed to provide specific evidence of Slater's and Hopkins' responsibilities at S+N, the extent to which they interacted with hospital administrators, or how the hospitals at issue limited, or did not limit, which devices were used.  Notably, Curtis stated that he had never met Hopkins or Slater, and had no specific knowledge of which Tucson hospitals they serviced for S+N.  (ECF No. 49 at PageID 539:6-540:24.)  Furthermore, Hopkins and Slater testified—and S+N failed to rebut—that they were hired by S+N to sell trauma products and cover operations for surgeons and that they had no role in negotiating contracts with hospitals.  (ECF No. 49 at PageID 641:11-22, 647:8-17, 702:12-13, 711:7-18.)  While Hopkins and Slater had some interactions with the hospital billing and sterile processing departments, they testified that these conversations were limited to routine administrative matters that had nothing to do with promoting S+N's products.  (Id. at PageID 648:4–8, 710:2–13.)

Because Hopkins' and Slater's job responsibilities did not include negotiating contracts or promoting S+N products to non-surgeons, it is reasonable to conclude that, at the time of execution, the parties to the Agreements would have understood "customer" to be focused on the surgeons with whom the two worked.  Thus, the Court once again finds that the parties to the Agreements—S+N, Hopkins, and Slater—likely intended for "customer" to refer to the individual surgeons that they primarily worked with.  And, even if there is ambiguity about who

should be considered the "customer," such ambiguity would be construed in Defendants' favor. See Murfreesboro Med. Clinic, 166 S.W.3d 674 at 678.

In the alternative, S+N argues that even if "customer" refers to surgeons, Slater breached the customer-based restriction by covering surgeries for Dr. Truchan on Stryker's behalf.  (ECF No. 55 at PageID 848.)  However, the evidence shows that Dr. Truchan stopped using S+N and became a Stryker customer several months before Slater joined Stryker.  (ECF No. 49 at PageID 591:18–592:19, 630:13–631:5, 708:4–22, 763:17–764:3.)  Slater testified that he even tried to persuade Dr. Truchan to stay with S+N when she decided to switch to Stryker.  (Id. at PageID 708:15–19.)  Because Dr. Truchan already decided to purchase Stryker products before Slater resigned from S+N, the Court finds that Slater did not violate the customer-based restriction by covering surgeries for Dr. Truchan on Stryker's behalf.

### B. Territory and Account-based Restrictions

As stated above, the Agreements define "restricted territory" as "**any geographic territories and/or accounts** (a) assigned to Employee during the Look Back Period, (b) where Employee solicited and/or serviced customers during the Look Back Period, and (c) for which Employee was responsible at any time during the Look Back Period."  (Id. at PageID 798) (emphasis added.)

S+N argues that Hopkins and Slater are violating the territory-based restriction in Sections 8.2 and 8.3 by performing the same job functions and engaging in sales activity on behalf of Stryker within the same geographic territory and for the same accounts that they serviced while working for S+N.[4]  (ECF No. 51 at PageID 797.)  In other words, S+N argues that

---

[4] S+N's briefing related to the TRO almost exclusively focused on establishing a breach of Section 8.1.  As such, the Court did not address the territory-based provision in its Order dissolving the TRO.  (ECF No. 21 at PageID 280, n.2.)

Defendants are violating the territory-based restriction because Hopkins and Slater are servicing the same geographic territory for Stryker that they were previously assigned for S+N. Alternatively, S+N argues that Defendants violated the territory-based restriction by servicing the same "accounts" for Stryker that they previously serviced at S+N.  The Court addresses both arguments below.

### 1.  Geographic Territory

According to S+N, Hopkins and Slater started working for Stryker in Tucson despite knowing that they were assigned the same geographic territory while at S+N.  (ECF No. 51 at PageID 798–99.)  Defendants contend that S+N presented no evidence that Hopkins and Slater were assigned to a particular geographic area, and thus they could not have violated a territory restriction.  (ECF No. 54 at PageID 833.)  The Court agrees with Defendants.  While it is undisputed that Hopkins and Slater worked in Tucson, S+N failed to provide evidence that showed that they were formally assigned to Tucson as their territory.  Furthermore, Hopkins and Slater both testified that S+N never assigned them the entire Tucson area.  (ECF No. 49 at PageID 638:20–23, 704:15–18.)  Because S+N did not show that Hopkins and Slater were assigned a specific geographic area, S+N cannot prove that they are violating the Agreements by servicing the same geographic area for Stryker.

### 2.  Accounts

Whether Hopkins and Slater were servicing the same accounts is a closer call.  In making this determination, the Court must address two questions: (1) What does "accounts" refer to; and (2) Were Hopkins and Slater assigned to a specific list of accounts?

As to the first question, "accounts"—like "customer"—is not defined in the Agreements. S+N argues that "accounts" is properly understood as including hospitals, given how medical

device companies, including S+N and Stryker, sell and receive payment for the products they sell.  (ECF No. 51 at PageID 801.)  According to S+N, it is undisputed that medical device companies contract with hospitals, not surgeons.  (Id.)  As Hopkins and Slater acknowledged, only after hospitals approve and stock the products can surgeons use them in surgeries.  After surgery, sales representatives submit invoices and purchase orders to the hospitals, who in turn pay the medical device company for the products.  In light of this industry-wide practice, S+N argues that "accounts" refer to hospitals, and, as a result, Hopkins and Slater are violating Sections 8.2 and 8.3 by working at the same hospitals they worked at while at S+N.[5]

Defendants disagree.  They argue that, like "customer," "accounts" is ambiguous because the Agreements do not define "accounts," and because both Hopkins and Slater testified that they understood "accounts" to mean the surgeons, not the hospitals.  (ECF No. 54 at PageID 834.)

Despite Hopkins and Slater's testimony about how they understood "accounts," the ordinary meaning of "accounts" suggests that the term refers to hospitals, not surgeons.  While "customer" refers to the person making the decision to purchase a product, "account" refers to the entity in charge of administering the services in a relationship between two parties.  (See Account, Miriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/account [https://perma.cc/4BLC-G6QJ] ("A formal business arrangement providing for regular dealings or services (such as banking, advertising, or store credit) and involving the establishment and maintenance of an account."))  Here, it is undisputed that the entity

---

[5] In its post-hearing brief, S+N takes several liberties in characterizing the hearing testimony.  For example, citing to a portion of Curtis' testimony, S+N states that, "[t]he evidence shows that while working for S+N, Hopkins and Slater knew that the 'accounts' were the hospitals and surgery centers."  (ECF No. 51 at PageID 800.)  However, this portion of cited testimony only discusses Curtis' own opinion about who he considers to be the "account," not how Hopkins and Slater understood that term.  Curtis did not even know who Hopkins and Slater were when they worked at S+N.

maintaining the account was the hospital, not the surgeons.  Therefore, the Court finds that the parties to the Agreements likely understood "accounts" to refer to the hospitals.

S+N argues that Hopkins and Slater are violating the account-based provision because they are servicing the same hospitals and facilities that they serviced for S+N.  (ECF No. 51 at PageID 799.)  Unfortunately for S+N, there remains a question of whether S+N can show that Hopkins and Slater were ever "assigned" any "accounts"—i.e. hospitals or medical facilities— while working for S+N.  As with "restricted territory," S+N failed to provide any evidence showing that it assigned Hopkins and Slater to a particular hospital or group of hospitals. Furthermore, Hopkins and Slater both testified that they were never assigned to a particular facility while at S+N.  (ECF No. 49 at PageID 638:20–23, 702:8–18.)  Because S+N did not show that Hopkins and Slater were assigned a specific account, S+N cannot prove that they are violating their Agreements by servicing the same accounts for Stryker.

### C.  Protectable Business Interest

Even if S+N could conclusively show that Hopkins and Slater violated the Agreements, S+N would still have to show that these noncompete provisions are enforceable restraints on trade that serve a protectable business interest.  See Vantage Tech., 17 S.W.3d at 644.  Again, there are three main considerations in determining whether an employer has a protectable business interest:  "(1) whether the employer provided the employee with specialized training; (2) whether the employee is given access to trade or business secrets or other confidential information; and (3) whether the employer's customers tend to associate the employer's business

with the employee due to the employee's repeated contacts with the customers on behalf of the employer."  Id.

Here, based on the evidence presented, none of these considerations support a finding that the Agreements, as interpreted by S+N, support a protectable business interest.  As to the first consideration, S+N argues that the training Hopkins and Slater received at S+N constitutes a protectable business interest and "allowed them to hit the ground running for Stryker."  (ECF No. 51 at PageID 810.)  However, the evidence suggests otherwise.  While they attended a training program at S+N's headquarters in Memphis, Hopkins and Slater testified that this program mainly addressed basic human anatomy and S+N specific products.  (ECF No. 49 at PageID 638:24–639:11, 705:1–24.)  As for the S+N product training, they testified that it was of no use to them at Stryker.  (Id. at PageID 640:12–16, 662:11–14, 706:22–707:4.)  And the training on basic human anatomy is not specialized knowledge that is "peculiar to the employer's business."  Vantage Tech., 17 S.W.3d at 645 (citation omitted); see also Hinson v. O'Rourke, No. M2014-00361-COA-R3-CV, 2015 WL 5033908, at *4 (Tenn. Ct. App. Aug. 25, 2015) (the owner of trivia business did not have protectable interest where training provided to employees was "widely available through other sources").  Therefore, S+N failed to show sufficient evidence of a protectable interest related to the training it provided to Hopkins and Slater.

As to the second consideration, trade secrets are defined as a secret "formula, process, pattern, device, or compilation of information that is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not use it."  Vantage Tech., 17 S.W.3d at 645 (citation omitted).  S+N contends that Hopkins and Slater "were privy to highly confidential and privileged information regarding S+N's business plans and strategies" and that they had "unfettered access to S+N's confidential, trade secret, and proprietary information."

(ECF No. 50 at PageID 781, 782.)  However, S+N fails to identify the specific confidential information or trade secrets Hopkins and Slater had access to during their employment. Furthermore, though Mohoric testified that Hopkins and Slater had access to confidential sales and pricing information, they testified that they did not remember this information, that they had not disclosed it to anyone, and that it is not relevant to their current jobs as Stryker has a distinct pricing system.  (ECF No. 49 at PageID 649:2–15, 719:18–720:15.)  Therefore, there is no proof that Hopkins and Slater were exposed to and revealed information that could give Stryker a competitive advantage over S+N.  As such, S+N failed to show a protectable business interest in trade secrets or confidential information.

Finally, as to the third consideration, an employer has a protectable interest in its relationships with its customers when an employee "in essence becomes the face of the employer."  Vantage Tech., 17 S.W.3d at 645.  As explained below, the Court rejects S+N's contention that Hopkins and Slater became "the face" of S+N's trauma sales business in Tucson. (See infra II.)  Therefore, S+N failed to show the existence of a special customer relationship.

Because S+N failed both to identify a breach of the Agreements and to establish a protectable business interest, the Court finds that, at this stage, S+N cannot show a likelihood of success on the merits of its claim.

**II.      Irreparable Harm**

The second factor to be considered when determining whether to issue injunctive relief is the "irreparable harm that could result if the injunction is not issued."  Smith + Nephew, Inc. v. Stryker Emp. Co., LLC, No. 21-cv-2772-SHL-cgc, 2021 WL 8697765, at *7 (W.D. Tenn. Dec. 30, 2021).  Irreparable harm is an "indispensable" requirement for a preliminary injunction, and "even the strongest showing" on the other factors cannot justify a preliminary injunction if there

17

is no "imminent and irreparable injury."  D.T. v. Sumner Cnty. Schs., 942 F.3d 324, 326–27 (6th Cir. 2019); see also 11A Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURES § 2948.1 (3d ed. 2023) (Irreparable harm is "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction . . . .").  "To merit a preliminary injunction, an injury must be both certain and immediate, not speculative or theoretical." Sumner Cnty. Schs., 942 F.3d at 327 (internal quotation marks omitted).

S+N argues that it is suffering, and will continue to suffer, great loss, damage, and immediate irreparable harm if Hopkins and Slater are not enjoined from violating the Agreements.  (ECF No. 51 at PageID 796.)  As they did in requesting that the TRO remain in place, S+N argues that the doctors and hospital staff that Hopkins and Slater serviced when employed by S+N viewed them as "the face" of S+N's trauma business in Tucson.  (Id. at PageID 808–09.)  S+N argues that it will continue to suffer an irreparable loss of customer goodwill and reputation if Hopkins and Slater, two prominent former S+N employees, are allowed to violate the Agreements and work with S+N customers on Stryker's behalf.  (Id. at PageID 809.)  In support, S+N cites Mohoric's testimony in which he detailed how, in general, losing sales representatives can hurt S+N's ability to maintain relationships with various members of the hospital ecosystem.  (Id. at PageID 803–04.)

In addition to the loss of customer goodwill, S+N also argues that, following Hopkins and Slater's resignations, S+N suffered monetary loss and was placed at a competitive disadvantage.  (ECF No. 55 at PageID 845.)  In support, S+N cites Mohoric's testimony in which he stated that S+N's Tucson sales team was short-staffed after Hopkins and Slater resigned, causing S+N to lose market share and hundreds of thousands dollars in sales.  (Id.)

In response, Defendants argue that S+N presented no evidence of any harm that it suffered as a result of Hopkins and Slater's actions.  (ECF No. 54 at PageID 838.)  Defendants further argue that, to the extent that S+N suffered any monetary losses in the wake of Hopkins' and Slater's resignations, those losses had nothing to do with a breach of the Agreements.  (Id.)

Once again, S+N failed to provide evidence of a "certain and immediate" injury that could merit injunctive relief.  See Sumner Cnty. Schs., 942 F.3d at 327.  Rather than provide specific evidence of a loss of customer goodwill, S+N relies on Mohoric's general testimony about the relationship between sales representative and other parts of the hospital ecosystem.  This type of general testimony, which makes no mention of Hopkins' and Slater's actual experience working at S+N, or their allegedly wrongful conduct, is insufficient to show irreparable harm.  Id.  S+N's argument about financial loss is similarly unsupported by the evidence.  Mohoric testified that S+N lost hundreds of thousands of dollars of sales, but there was not evidence of a single lost sale or customer that could be attributed to Hopkins' and Slater's conduct.  Furthermore, without more proof, any market share that S+N lost because of staffing shortages is not connected to Hopkins' and Slater's alleged breaches as S+N would have been short-staffed no matter the reason why Hopkins and Slater decided to leave.  Because S+N failed to provide evidence that could show loss of business or customer goodwill, the Court finds that S+N cannot show irreparable harm.

The Court's repeated rejections of S+N's requests for injunctive relief should not be taken as being hostile toward the enforceability of noncompete agreements.  In Smith + Nephew, Inc. v. Stryker Emp. Co., LLC, No. 21-cv-2772-SHL-cgc, 2021 WL 8697765 (W.D. Tenn. Dec. 30, 2021), a case that also involved a S+N employee switching to Stryker, the Court granted S+N's request to keep a TRO in place that enjoined the employee from violating his noncompete

agreement.  In finding that S+N made a showing of irreparable harm, the Court noted that S+N provided declarations and text messages showing that the employee at issue violated his noncompete agreement by soliciting S+N employees and customers on Stryker's behalf, thereby eroding customer goodwill.  Smith + Nephew, Inc., 2021 WL 8697765, at *7–8.  The crucial difference is that, here, S+N failed to provide specific evidence of how Hopkins and Slater are violating the Agreements, and how these violations are causing irreparable harm.

In its order dissolving the TRO in this matter, the Court explained that S+N failed to provide specific evidence—such as affidavits from hospital administrators attesting to Hopkins' and Slater's reputations at S+N or the degree of their involvement with hospital staff—to support its argument that Hopkins and Slater were "the face" of S+N.  (ECF No. 21 at PageID 286.) S+N has still provided no such evidence.  Furthermore, S+N did not identify a single lost sale, converted customer or any attempted interference whatsoever that could be attributed to Hopkins' and Slater's conduct.  Therefore, because S+N failed to provide evidence of loss of business or customer goodwill, or actions that might lead to such losses, there has been no showing of irreparable harm.  As this litigation further develops, S+N may introduce specific evidence showing that it has been harmed because of Hopkins' and Slater's breaches of the Agreements.  However, the longer S+N is unable to produce evidence of injury, the more difficult it becomes to escape the conclusion that such evidence does not exist.

### III.    Public Interest

"Tennessee and the Sixth Circuit recognize a public interest in enforcing contracts as written."  Smith + Nephew, Inc., 2012 WL 6607289 at *14.  On the other hand, restraints of trade such as noncompete agreements are disfavored in Tennessee.  Murfreesboro Med. Clinic,

166 S.W.3d at 678.  Therefore, the Court finds that this factor does not weigh in either Party's favor.

## **CONCLUSION**

After considering these factors, the Court finds that, on balance, they weigh in favor of denying injunctive relief.  S+N fails to meet its burden of justifying the need for a preliminary injunction.  Therefore, the Court **DENIES** S+N's Motion for Preliminary Injunction.

**IT IS SO ORDERED,** this 29th day of September, 2023.

s/ Sheryl H. Lipman
SHERYL H. LIPMAN
CHIEF UNITED STATES DISTRICT JUDGE